UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

UNITED STATES OF AMERICA     )
                                    )
          v.               )     Criminal No.: 5:21-cr-75-gwc
                                    )
GEORGE CASEY,            )
      Defendant.         )

## GOVERNMENT'S OPPOSITION TO MOTION TO SUPPRESS EVIDENCE AND REQUEST FOR A HEARING PURSUANT TO *FRANKS v. DELAWARE*

The United States of America, by and through its attorney, Nikolas P. Kerest, United States Attorney for the District of Vermont, hereby files its opposition to defendant George Casey's Motion Suppress Evidence and Request for a Hearing Pursuant to *Franks v. Delaware.* (the Motion) (Doc. 54). For all of the reasons that follow, the Motion should be denied.

## I.    INTRODUCTION

In July 2020, little girls living in Colchester, Vermont complained that George Casey had sexually assaulted them. Law enforcement interviewed them, as well as the father and a family friend of one of the girls, and Casey himself.[1] Thereafter, law enforcement presented a search warrant to a state court judge seeking evidence of lewd and lascivious conduct with a child, possession of child pornography, and disseminating indecent material to a child, in violation of state law. The judge signed the warrant. Digital media seized from Casey pursuant to the warrant was forensically analyzed. Five videos were discovered that showed two of the complaining little girls being sexually assaulted by Casey. Casey's face is seen in one of the

---

[1] The government acknowledges that Casey's preferred pronouns are "they/them." For consistency with the wording in the Affidavit and clarity in this response, however, the government will refer to Casey herein by name or "he/him." The government means no disrespect in doing so.

videos, as well as Casey's distinctive tattoo.  Following discovery of this material, Casey was arrested and charged federally with production of child sexual abuse material (CSAM, or child pornography).

Casey seeks suppression of the search warrant.  He claims that the affidavit in support of the warrant contains material misstatements and omissions that vitiate probable cause, that the warrant was stale and overbroad, and that the good faith exception should not apply.  As set forth below, Casey's arguments are without merit and the Motion should be denied.

## II.    **PROCEDURAL BACKGROUND**

On August 12, 2021, a criminal complaint was filed against Casey, charging him with production of CSAM.  (Doc. 1).  On August 26, 2021, the grand jury returned an indictment charging Casey with two counts of production of CSAM, in violation of 18 U.S.C. §§ 2251(a), (e), and one count of possession of CSAM, in violation of 18 U.S.C. §§ 2252(a)(4)(B), (b)(2).  (Doc. 18).  On September 2, 2021, the grand jury returned a First Superseding Indictment, which added two counts of production of CSAM.  (Doc. 22).  On December 1, 2022, the grand jury returned a Second Superseding Indictment.  The Second Superseding Indictment added two counts of accessing CSAM with the intent to view it, in violation of 18 U.S.C. §§ 2252(a)(4)(B), (b)(2).  (Doc. 53).

## III.   **THE SEARCH WARRANT**

On March 5, 2021, Vermont State Police (VSP) Detective Trooper David Hurwitch, assigned to the Chittenden Unit for Special Investigations (CUSI), obtained a warrant to search Casey's residence, located at 139 Gilman Circle #4, Colchester, Vermont (the Warrant).  The Warrant sought evidence of violations of the following Vermont state laws: 13 VSA § 2602 (lewd or lascivious conduct with a child), 13 VSA § 2827 (possession of child pornography), and

13 VSA § 2802 (disseminating indecent material to a minor).  (*See* Exhibit A to the Motion (Doc. 54-2)).  The affidavit in support of the Warrant (the Affidavit) contained the following facts, among others:

On Friday, July 31, 2020, Jeanne Bomboli alerted the Colchester Police Department that her daughter, AB, then five years old, had been touched over her clothes in her vaginal area by Casey.  Bomboli further disclosed that another child, MA, had been digitally penetrated by Casey, though she did not know when that occurred.  (*Id.* at ¶ 2).

On August 3, 2020, Det. Hurwitch and Investigator Staiano of the Department for Children and Families interviewed AB.  The interviewers reviewed the rules of a forensic interview with AB.  The Affidavit contained a synopsis of the interview.[2]  Though the questioners tried, AB did not want to talk about what had happened.  (*Id.* at ¶¶ 4-7).

Also on August 3, 2020, the same investigators conducted a forensic interview of TG, AB's sister.  TG was then four years old.  TG spoke of playing with friends, including her friend SH.[3]  TG described SH's father as "mean" and said that he uses a lot of "bad words."  TG reported that MA and SH took off their underwear, and she saw it on the computer.  TG also stated that SH's uncle touched SH's and MA's buttocks when they were not wearing underwear.[4]  TG said that there were three computers in the room.  TG said that she told her mother (Bomboli) what had happened, and she also told SH's father.  TG then asked to end the interview.  (*Id.* at ¶¶ 8-10).

---

[2]  The Affidavit indicated that its descriptions of what occurred in each interview was a "synopsis" of the disclosures, and referred the reader to a recording of the interview.  Also, for each forensic interview of a child, the Affidavit reported that the rules of a forensic interview were reviewed with the child, such as the need to tell the truth and only talk about things that happened.

[3]  Casey lived at the Gilman Circle residence with his two brothers, Justin Hatin and Daniel Barron.  (Doc. 54-2 at 1).  SH is Justin Hatin's daughter. (Doc. 54-2 at ¶ 37).

[4]  TG did not identify Casey by name in her interview.  As detailed herein, *infra* at 11, it is clear from the entirety of TG's interview that she was referring to Casey.

The following day, August 4, 2020, DCF Investigator Staiano conducted a forensic interview of MA.  MA was five years old.  MA spoke about her family and friends, said that she lives with AB and TG, and said that she is friends with SH.  She said she and SH fight a lot.  MA initially said that she had not been to SH's house.  She said SH lives with her father and her uncle, "the one who does all the inappropriate stuff."  MA identified this uncle as "Georgie," and described him as "mean and inappropriate."  MA described Georgie's room.  (*Id.* at ¶ 11-13). MA disclosed that Georgie "takes off SH's pants" and "takes off his pants."  MA has seen Georgie take off his pants.  SH keeps her shirt on.  SH and Georgie watch inappropriate stuff on YouTube, which involved "watching someone put their mouth in their private part."  MA added that SH and Georgie were doing everything and "watching it on Friday night," though she was not there as she "went to the park."  MA said that when SH and Georgie were watching the video, they were naked on the swings and everyone laughed at them.  MA said she "snitched" and told SH's father that SH and Georgie were doing inappropriate stuff and taking off their clothes.  Georgie was mean to MA, and he pushed her down and made her mouth bleed.  Inv. Staiano tried to further clarify MA's statement, but was not successful.  (*Id.* at ¶ 14).

Inv. Staiano also interviewed SH on August 4, 2020.  SH was then seven years old.  SH said that she "kinda forgot what happened a little bit" because she had "too much other stuff" on her mind.  (*Id.* at ¶¶ 16-20).  SH admitted that she had lied to the police earlier because she "was worried she was going to get in trouble."  After being reassured that she would not, SH said she knew that she was there to talk about "what happened at my dad's."  SH said that as for her uncle, "usually he's rubbing his private [sic] and he has like pictures, but I don't know what the pictures are though."  (*Id.* at ¶¶ 21-22).  She mentioned that some of the other girls (TG, AB, and MA) will sometimes lie.  SH said that she plays video games with her uncle in his room.  She

usually sits on his bed and he is in a chair.  Her uncle will "rub his privates" and that he's usually "rubbing it."  She added that "mostly all the time we play games he usually does it."  SH said that "[m]ost of the time I don't go into my uncle [sic] room without any clothes."  SH said that her uncle "rubs it and it makes me scared sometimes.  I just try not to look cause he makes me like feel weird" and she just plays the game.  (*Id.* at ¶¶ 23-24).  She specifically identified that he rubbed "that part of his body [he uses] to pee."  (*Id.* at ¶ 25).  SH said that she, MA, TG, and AB would play games in her Uncle Georgie's room.  The girls would sit on the bed, and he sat on a chair.  SH said he has a lot of electronics, including two computers.  There were "pictures of girls in bathing suits" on the wall in Georgie's room.  (*Id.* at ¶ 27).

SH said further that she always tells the other girls that they have to wear pants when visiting her uncle, because "I don't want something bad to happen or something else to happen."  SH said that Georgie would smell and touch their hair.  (*Id.* at ¶ 29).  SH said her uncle had a "kind of like a happy face smile" when he was rubbing his privates.  (*Id.* at ¶ 32).  She mentioned that she would be "all right not seeing my uncle" and that if he left the apartment, she would "get my own bedroom."  She also "wouldn't have to worry about this again[.]"  SH concluded by disclosing that "only TG, AB, and MA saw her uncle rub his privates and that she had not talked about it with them."  (*Id.* at ¶ 34).

On September 24, 2020, Det. Hurwitch spoke with Justin Hatin, Casey's brother and SH's father, and Shannon Naylor, Hatin's friend and whom he asked to be present as a support person.  (*Id.* at 36).  Hatin said that he knew that MA and TG had been to the residence and had been in Casey's bedroom playing video games.  Casey has several computers and TVs in his room.  Hatin confirmed that when the girls were in Casey's room, they were on the bed and

Casey was in a chair.  Hatin said that Casey sticks to himself and plays games in his room.

Casey "did not spend much with SH until recently."  (*Id.* at ¶¶ 35-40).

Naylor offered that she had seen Casey masturbating in his room with the door open, and that he discussed sexual matters with her.  She mentioned that he does not have good social skills.  (*Id.* at ¶ 40).  SH had told Naylor that while she wants to go home, she is "not wanting to go back home until he's [Casey] not there."  Naylor had noticed "recent changes in SH."  SH would "check the locks several times before she could calm down and go to sleep[,]" and was "waking up during the night more often."  Naylor knew SH and "believes something has been bothering SH recently."  (*Id.* at ¶ 41).  Naylor mentioned that SH told her that she did not like it "when the boys walk in on me when I'm in the bathroom at night, mostly George."  (*Id.* at ¶ 42).  Aside from Naylor's observations of SH, the Affidavit recounted a statement Casey made to Naylor about his pornography collection.  Specifically, Naylor mentioned that Casey told her "well I guess I deleted all my porn for nothing" because the police were not coming.  (*Id.* at ¶ 44).

On February 2, 2021, Det. Hurwitch and CUSI Det. Boyer interviewed Casey at the Gilman Circle residence.  (*Id.* at ¶ 46).  Casey said that he "just want[ed] to forget about it and move on with my life."  Casey "thought [the girls] possibly saw something they shouldn't have on his computer and reported it to their parents[,]" and that it was "misinterpreted due to a language barrier."  Casey said that the girls might have seen "adult stuff, which is easy to find[,]" but there would be no "child stuff" on his computer.  Casey said that he watched mostly "anime porn" because he finds "real porn … too unrealistic and gross."  He denied showing SH porn and said that they only watched YouTube videos while playing games.  Casey stated that "I would rather kill myself before touching a kid inappropriately" and "in the past and stuff [I] have

instead cut myself to prevent myself from thinking those kind things [sic], in the past, like years ago." (*Id.* at ¶ 49). Casey refused to talk about his masturbation practices. (*Id.* at ¶ 50).

Det. Hurwitch asked Casey if all they were dealing with was Casey watching "porn with the kids," or is there more? Casey answered: "I wouldn't know." Casey mentioned that he has memory problems and said he had no recollection of whether he watched pornography with the girls and masturbated, but that was the sort of thing he would remember if it had happened. (*Id.* at ¶ 51). Casey said he did "not really" need help for what happened with the girls and added "I don't think it's important." (*Id.* at ¶ 52). Det. Hurwitch told Casey of a prior disclosure of abuse made by SH. Casey indicated "stuff hasn't been happening with SH." When asked if Casey was saying that "stuff hasn't been happening for a long time with SH[,]" Casey replied that he did not know. Casey said he did not know if what happened to SH was "a one-time thing or is this something that has been happening for a long time[,]" and added "I'm definitely not going to remember something that happened that long ago." Casey then terminated the interview. (*Id.* at ¶ 53).

## IV. <u>LEGAL FRAMEWORK AND ANALYSIS</u>

Casey claims that the Warrant and the resulting evidence should be suppressed because Det. Hurwitch intentionally made misrepresentations and omissions in the Affidavit that were material to the finding of probable cause, which finding fails once the misrepresentations and omissions are addressed. Casey also claims that the probable cause for the Warrant was stale, the Warrant was overbroad, and law enforcement should not be entitled to rely on the Warrant in good faith. For the following reasons, Casey's claims should fail.

### A.   Casey Has Failed to Meet His Burden to Obtain a Franks Hearing

#### 1.   Statement of the Law

In *Franks v. Delaware,* the Supreme Court held that search warrant affidavits are entitled to "a presumption of validity."  438 U.S. 154, 171 (1978).  To overcome this presumption and obtain an evidentiary hearing on the truthfulness of a warrant affidavit, a defendant must overcome a two-step hurdle.  *Id.* at 155-56.  A defendant must make a "substantial preliminary showing" that (1) the affiant either "knowingly or intentionally" made a false statement or made a false statement "with reckless disregard for the truth," and (2) that the affiant's allegedly false statement "is necessary to the finding of probable cause."  *Id.*  Only statements that are both intentionally or recklessly false and material require suppression.  To the extent that Casey claims the affidavit omitted material information, those facts are handled the same way.  *United States v. Ferguson*, 758 F.2d 843, 848 (2d Cir. 1985).  While in certain circumstances recklessness may be inferred from an omission, such an omission must be "clearly critical" to the probable cause determination.  *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991).

To obtain a *Franks* hearing, "the challenger's attack must be more than conclusory and must be supported by more than the desire to cross-examine."  *Franks*, 438 U.S. at 171.  The defendant must allege a deliberate falsehood or reckless disregard for the truth, and "those allegations must be accompanied by an offer of proof."  *Id.*  In support of this claim, the defendant should provide the reviewing court with "[a]ffidavits or sworn or otherwise reliable statements of witnesses" or at least satisfactorily explain the absence of such proof.  *Id.*  If a defendant is able to meet the stringent requirements for a *Franks* hearing, a defendant must then establish by a preponderance of the evidence that the affiant deliberately lied or made a false statement with reckless disregard for the truth.  *Id.* at 156.  If a defendant meets that burden, then

the reviewing court is called upon to set aside the false information and evaluate whether the affidavit's remaining content is sufficient to establish probable cause. *Id*.

To examine a challenged misstatement, the Court first looks to the affiant's subjective intent in including it. *Id.* The *Franks* standard "protects against omissions that are designed to mislead, or that are made in reckless disregard of whether they would mislead, the magistrate." *United States v. Awadallah*, 349 F.3d 42, 67-78 (2d Cir. 2003). "[M]isstatements or omissions caused by 'negligence or innocent mistake[s]' do not warrant suppression." *United States v. Rajaratnam*, 719 F.3d 139, 153 (2d Cir. 2013) (citing *Franks*). "To determine whether misstatements are material, a court must set aside falsehoods in the application and determine whether the untainted portions of the application suffice to support" a finding of probable cause. *Id.* (internal quotation marks and citations omitted). If the affidavit provides probable cause without the misstatement, it remains valid. *Id.* at 146.

### 2.    Argument

Casey contends that the affiant intended to mislead the issuing judge by misrepresenting what the witnesses said or omitting critical information. The government disagrees. A review of the transcripts of the witness interviews shows that Det. Hurwitch endeavored to present an accurate synopsis of the disclosures made by very young child victims about traumatic events. The government addresses each of Casey's claims below:

- TG's statement

Casey suggests that the Affidavit misrepresented the context around TG's statement that "MA and SH took off their underwear and she saw it on the computer." (Motion at 16). Casey claims that the reference should have included that TG said that the computer was at school, not in Casey's bedroom. That is not what TG said. The full exchange is below:

Interviewer:    Can you tell me about SH's uncle?[5]

TG:       First of all, MA and SH take off their underwear.  MA and SH saw the (indiscernible) ….

Interviewer:    You saw it on the computer?  Did you see it?

TG:       Yeah and AB saw it.

Interviewer:    AB saw it, too?  And you said that whose uncle did that?

TG:       SH's.

Interviewer:    SH's uncle took off MA and SH's underwear?

TG:       No, they did.

Interviewer:    They did.  Can you tell me more about that?

TG:       That's all.  That's all.

Interviewer:    That's all?

Male Interviewer:       What happened when they took off their underwear?

TG:       They, and then they, their uncle was touching their butts and (indiscernible)…

Male Interviewer:       So I just want to make sure I heard you correctly.  It's a little bit tough to hear you.  But did you say that they put their butts in their uncle's hand?

TG:       No, they took in the hand in their butts.

Male Interviewer:       Whose hands touched whose butt?

TG:       MA's and SH's.

Male Interviewer:       Okay.  And whose hand was it?

TG:       Her uncle.

Male Interviewer:       So their uncle touched their butt?  And did you say they weren't wearing any clothes?

TG:       No, just their underwear.

Male Interviewer:       Just their underwear?

Interviewer:    Just their underwear off you said?

TG:       Mm-hmm (indicating affirmatively).

Interviewer:    Okay.  Were you there?

TG:       Yeah, and my sister (indiscernible).

Interviewer:    Do you remember seeing anything else?

TG:       Only just (indiscernible).

Interviewer:    Tell me about the computer.

TG:       The computer.  Well, it was three computers.

Interviewer:    Three computers.  Where were they?

TG:       In… [loud wind blowing]

Interviewer:    They were in where?

TG:       In his room.

Interviewer:    In his room?  Okay.  And where were you guys?

TG:       In school.  (indiscernible)

Interviewer:    In school but then you came back?

TG:       Yeah.

Interviewer:    Yeah?  And where were you when you saw the computers?

TG:       At school.

---

[5]  The child's full name is replaced by her initials in these excerpts from the transcripts.

(Ex. 1 at 22:19-25:14).  The Affidavit accurately recounts that the four-year-old child said that MA and SH were without underwear and she saw it on the computer, and that the computers were in Casey's room.  When read in context, the child refers to being in school that day, but then coming back.  The Affidavit was not misleading.

Casey also claims that the interview is misleading in that it asserts that the uncle about whom TG was referring is Casey, whereas TG allegedly never identified Casey as the perpetrator and SH has two uncles with whom she was living.  It is abundantly clear from the interview that TG is referring to Casey.  Specifically, TG disclosed that she told her mom that SH's uncle "was touching their butts."  (Ex. 1 at 26:5-27:1).  TG also mentioned that she first met with the police after her "mom called the police about the stuff with SH's uncle[.]"  (Ex. 1 at  28:11-16).  The Affidavit further stated that TG's mother Jeanne Bomboli called the police to report that Casey had touched her daughter AB [TG's sister] "over the clothes in her vaginal area."  (Doc. 54-2 at ¶ 2).  It is without question that TG was referring to Casey during the interview, and the Affidavit was not misleading.

Lastly, Casey complains that the Affidavit should have included that TG said that she did not know SH's dad or uncle or their names, and that when TG was at the residence "no one else was home" after TG said that she played "Fortnite and robots" at SH's home.  (Motion at 4).  The full exchange is below:

> Interviewer:    And where did you play with SH?
> TG:      At her house.
> Interviewer:    At her house?
> TG:      Yeah.
> Interviewer:    And where does she live?
> TG:      She lives in MA's house, MA's neighbor.
> Interviewer:    She's MA's neighbor.  What did you play?
> TG:      In her house.
> Interviewer:    In her house.  Did you play a game, did you…
> TG:      We played Fortnite and robots.

Interviewer:    You played Fortnite and what?
TG:    Robot.
Interviewer:    Robot.  What kind of robot?
TG:    Umm, robot building.
Interviewer:    Billy?  Who's Billy?
TG:    Building robot.
Interviewer:    Building the robot, thank you.  Is anybody else at SH's house?
TG:    Her dad, her uncle, she has an uncle.
Interviewer:    Her dad and who?
TG:    Uncle.
Interviewer:    Her uncle and her dad.  Do you know what her dad's name is?
TG:    No.
Interviewer:    You don't.  Do you know what her uncle's name is?
TG:    No.
Interviewer:    Have you ever met them?
TG:    Only SH.
Interviewer:    Only SH?  Was anybody else home with you when you were playing with SH?
TG:    Nobody.
Interviewer:    Nobody else?  Was anybody else inside of her house?
TG:    Yeah.

(Ex. 1 at 19:20-21:20).  It is not surprising that a four-year-old child would not know the names of the parents of her playmates, or that she would misunderstand the question of whether anyone else was home when she was playing with SH, only to correct it in response to the following question.  These comments were not material.

• MA's Statement

Casey asserts that MA, a five-year-old little girl, intentionally lied when she told the interviewer that she was in high school, and such lie should have been included in the Affidavit. (Motion at 5).  The government acknowledges that MA, after saying that she was in first grade, maintained that she was in high school.  (Ex. 2 at 10:25-12:19).  This exchange occurred at the beginning of the interview, when the interviewer was reviewing with MA the difference between the truth and a lie.  At the end of this exchange, MA acknowledged that the truth was that she was not in high school, as follows:

> Interviewer:   But what grade are you in?
> MA:   High school.
> Interviewer:   So remember how I said we want to make sure that we follow the rules?
> MA:   Yeah.
> Interviewer:   So, one of the rules is to tell the truth.
> MA:   I don't know.
> Interviewer:   You're not in high school?
> MA:   Mm-hmm (indicating affirmatively).

(Ex. 2 at 12:9-19).[6]  In any event, the omission of the five-year-old's momentary assertion that she was actually in high school is immaterial to the credibility of her observations of Casey doing "inappropriate stuff" with SH and "taking off SH's pants," among other things, when such observations were corroborated by statements from the other little girls.  Moreover, the Affidavit included details of a fantastic story that alerted the reviewing court to possible credibility issues with MA, which are detailed below.

Casey notes that MA said that she lived with AB and TG, when in fact she does not. (Motion at 5).  Again, where and with whom MA lived was not material.  Nor was it material to her credibility since she had already told the interviewer that she lives with her family.  (Ex. 2 at 4:18-5:5:24) (Interviewer: "[A]nd do you all live together?" MA: "Yes.")  Moreover, the residence where Casey and the victims lived is a multi-story house with several units.  (Doc. 54-2, at 1).  Casey and the child victims lived in the same house, though in different units.  The five-year-old quite likely believed that her affirmative answer to the question of whether she lived with her friends was correct.

Casey also contends that the Affidavit should not have omitted MA's statement that she had never played at SH's house, SH walked to Canada, and that once SH did it, MA walked to Canada as well.  (Ex.2 at 44:17-45:6).  It is important to note that these comments were offered

---

[6]   When reviewing the transcript, the Court should be aware that MA was playing with Play-Doh and drawing pictures that she wanted to give to her mom during the interview, which explains some of the tangential comments.

when MA was discussing how SH was mean to her.  (Ex. 2 at 44:4-11) (Interviewer: "Do you play at [SH's house?"  MA: "No."  Interviewer: "You don't?"  MA: "Because she's mean." Interviewer: "Because she's mean.  Okay.  Have you ever played at [SH's] house?"  MA: "No."). Later in the interview, of course, when discussing that MA saw SH's uncle Georgie "take[] off [SH's] pants" and saw Georgie with "no clothes on" (Ex. 2 at 52:3-53:18), MA mentioned how she had been in Georgie's room and described it as "black and teal" and "looking ugly."  (Ex. 2 at 56:18-57:7).  The child's earlier comments about not having played at SH's house or having walked to Canada with SH were obviously mistaken and not material to probable cause.  In addition, these comments would have been cumulative to the comments set forth below, about how Casey and SH viewed videos while naked on swings in a park.

Lastly, Casey claims that the Affidavit should not have omitted in paragraph 13 that when MA said that she was not there when SH and Casey were watching pornographic videos using the Internet, that Casey had gone shopping and was not there on the Friday night, or the fantastic story that Casey and SH watched the videos while naked on the swings at a park. (Motion at 5).  Casey is correct that these matters were not mentioned in paragraph 13.  They were mentioned in paragraph 14.  (Doc. 54-2, ¶ 14).  Indeed, mentioning the fantastic story was an entirely appropriate disclosure to the reviewing court about the credibility of the child giving the information.  In issuing the warrant with that pertinent disclosure, the reviewing court obviously found her to be credible.

• SH's Statement

Casey does not challenge the accuracy of any of SH's disclosures set forth in the Affidavit, including that Casey masturbated in front of her and that conduct made her feel weird and scared, that Casey did not always wear pants, that SH instructed her friends always to wear

14

pants when they came to her home to play because SH did not "want something bad to happen or something else to happen," that she and her friends played games in Casey's room, that AB, TG, and MA all saw Casey masturbating, that SH was "all right not seeing my uncle [Casey,]" and that if Casey left the house she "wouldn't have to worry about this again[.]"  Casey also does not contest that SH said that Casey has a lot of electronics, including two televisions and two computers, and that there were pictures of girls in bathing suits on Casey's wall.

- Statements from Justin Hatin and Shannon Naylor

Casey implies that the Affidavit omitted Justin Hatin's statement that that he had never seen anything "between George and SH."  (Motion at 6).  Casey is incorrect.  The Affidavit contains the following statement: "Justin advised that he never saw anything between George and SH."  (Doc. 54-2, ¶ 40).  Casey further implies that the Affidavit failed to include that Justin Hatin did not give any information that he had ever witnessed or had concerns about whether Casey possessed child pornography, or that he did not have concerns about whether the sexual assaults were recorded.  The Affidavit did not include that because child pornography was never specifically discussed in the interview.[7]

Casey further alleges that the Affidavit was misleading in how it presented Naylor's and Hatin's recounting that Casey told them that "I deleted all my porn for nothing" because the police were not coming.  (Doc. 54-2, ¶ 44).  That statement is an accurate quote and accurately reflects the context in which it was given.  (Ex. 3; 54:1-55:3).  The Affidavit did not improperly fail to include the response from Hatin and Naylor to Det. Hurwitch's question of "what type of porn are we talking about?" which was "mainly that anime stuff, I think" and "the anime stuff." (Ex. 3; 55:4-10).  The omission of that answer was not misleading because anime pornography is

---

[7]  To Casey's benefit, the Affidavit did not include his brother's suspicion that the little girls were not lying and that Casey had, in fact, sexually assaulted them.  (Ex. 3; 50:20-51:25).

not illegal.  There would be no reason for Casey to delete it to avoid the police finding it, and

there was no reason to include their speculation as to what type of porn Casey was referring.

The Affidavit did, notably, mention Naylor's statement that Casey "had an interest in weird sex

toys and anime porn."  None of these alleged omissions was material to the probable cause

determination.

- • Casey's Statement

Casey does not suggest that the Affidavit's recitation of Casey's statement was in any

way misleading or that anything material had been omitted.  (Motion at 6).

- • Information about the SANE Exams

Casey asserts that the Affidavit recklessly omitted information regarding the physical

exams of the little girls.  Here again, this was not a reckless omission, for several reasons.  To

begin, generally, an Affidavit need not recount every investigative step.  An "otherwise sufficient

application for a search warrant need not relate unproductive or unsuccessful efforts in the course

of the investigation."  *United States v. Smith*, 9 F.3d 1007, 1014 (2d Cir. 1993).  Indeed,

requiring an affiant to recount in an affidavit every investigative step that failed to bear fruit

would place an unreasonable burden on investigators.  As the Ninth Circuit has stated,

"Obviously in any investigation there will be probes that yield nothing.  When strong probative

evidence of criminal activity is uncovered, there is no point in reporting unproductive

surveillance.  Innocent activity does not disprove the observed evidence of criminal conduct."

*United States v. Watts*, 848 F.2d 134, 137 (9th Cir. 1988).  *See Rivera v. United States,* 928 F.2d

592, 604 (2d Cir. 1991) (an omission in a search warrant affidavit will not be found to be

reckless unless the omitted information was "clearly critical" to the probable cause

determination) (citations omitted).

In addition, the warrant sought evidence of three crimes: lewd and lascivious conduct with a child, possession of child pornography, and disseminating indecent material to a minor. None of these crimes requires physical contact.  Consequently, information relating to the children's physical exams was not material to the probable cause analysis.  Put another way, if the physical exams had shown injury, the application likely would have sought evidence of additional crimes, such as a violation of 13 V.S.A. § 3253a, aggravated sexual assault of a child.

•    <u>Information that Casey Filmed A Child or Violated Federal Law</u>

While this is not a *Franks* issue because it does not go to probable cause, Casey also complains that the Affidavit did not contain any indication that Casey violated Vermont state law "related to the video taping of a minor[, and nor] did the warrant seek to search for evidence of a violation of 18 U.S.C. § 2260 or other federal child pornography offenses."  (Motion at 8).  That is not entirely accurate because the Affidavit did include TG's statement that "MA and SH took off their underwear and she saw it on the computer."  (Doc. 54-2, ¶ 10).  Regardless, the Warrant did not seek evidence of violations of the state production of child pornography statute and therefore the omission, if any, of facts to support that allegation is not relevant and certainly not material.  Further, a Vermont state court judge does not likely have authority to issue a warrant searching for evidence of violations of federal law.  Casey's complaint here should be set aside.

While the Affidavit does not contain material misrepresentations or reckless omissions, even if the Court reviewed the Affidavit as Casey requests, Casey is not entitled to a *Franks* hearing because the Affidavit *still* states probable cause.

The Affidavit contained the following salient details, among others:

•      From TG:  She saw MA and SH take off their underwear and she saw it on the computer; SH's uncle (Casey) touched SH and MA's buttocks when they were not wearing underwear; there were three computers in Casey's room; and she told her mother and SH's father what had happened.  (Affidavit ¶ 10).

•      From Jeanne Bomboli: She learned that her daughter had been sexually assaulted by George Casey; and that a neighbor child had been digitally penetrated by Casey, though she was unsure when that happened.  (Affidavit ¶ 2).

•      From MA:  SH lives with her uncle Georgie, who is the one who does all the inappropriate stuff; MA had been in Georgie's room; she has seen Georgie take off SH's pants and take off his own pants; SH and Georgie will watch inappropriate stuff on YouTube; the inappropriate stuff included watching someone put their mouth in their private part; they are doing everything; and MA snitched and told on Georgie and SH for doing inappropriate stuff and taking off their clothes.  (Affidavit ¶¶ 11-15).

•      From SH:  She knew she was there to talk about what happens at her dad's house with her uncle; she and her friends play at her dad's house and will play games with her uncle; her uncle is usually rubbing his privates and looking at pictures (though she did not know what the pictures were); her uncle rubs his private parts when the girls are playing games in his room; SH identified the private part being rubbed by Casey as the part of his body used to pee; Georgie has a lot of electronics, including two televisions and two computers; Georgie has pictures of girls in bathing suits that were on his wall; SH instructs her friends always to wear pants when they visit her home because "I don't want something bad to happen or something else to happen;" and SH was "all right not seeing my uncle" because "I wouldn't have to worry about this again[.]"

- From Justin Hatin and Shannon Naylor: Casey has several computers and TVs in his room; SH, MA, and TG were sometimes playing games in Casey's room; the girls sat on the bed in Casey's room and Casey sat in a chair; SH does not like it when the boys, mostly George, walk in on her when she is in the bathroom at night; SH has changed recently, had trouble settling down to go to sleep, and did not want to go back home until Casey was no longer there; and about three weeks earlier (approx. Sept. 3, 2020), Casey said that "he deleted all his porn for nothing" because the police were not coming.

- From Casey's statement: Casey wanted to "forget about it and move on with my life;" the girls were playing video games and they "possibly saw something they shouldn't have on his computer and reported it to their parents;" they would have seen adult stuff, but he did not have child stuff; the majority of pornography that he views is anime pornography because he does not like "real porn;" he would rather kill himself than touch a child inappropriately; he has "in the past and stuff have instead cut myself to prevent myself from thinking those kind things [sic], in the past, like years ago;" Casey believed that he would remember if he had watched porn with the girls and touched himself, but he did not have any recollection of that; and upon being told of a previous disclosure of abuse by SH, Casey said that he was not aware of whether the abuse had been happening for a long time with SH, and if it had he would not remember something that happened long ago; and he did not know if it was a one-time thing or something that had been going on for a long time.

In light of this information, the Affidavit abundantly stated probable cause.  Probable cause is "'a fluid concept,' turning 'on the assessment of probabilities in particular factual contexts,' and as such is not 'readily, or even usefully, reduced to a neat set of legal rules.'" *United States v. Falso*, 544 F.3d 110, 117 (2d Cir. 2008) (quoting *Illinois v. Gates*, 462 U.S. 213,

232 (1983)).  Whether probable cause exists "'requires a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"  *United States v. Martin*, 426 F.3d 68, 74 (2d Cir. 2005) (quoting *Illinois v. Gates*, 462 U.S. at 238).  When construing an affidavit to assess probable cause, the affidavit should be taken as a whole and read realistically. *United States v. Salameh*, 152 F.3d 88, 113 (2d Cir. 1998).  A reviewing court is to accord "substantial deference to the finding of an issuing judicial officer that probable cause exists." *United States v. Raymonda*, 780 F.3d 105, 113 (2d Cir. 2015) (quoting *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993)).  The reviewing court's inquiry is limited to evaluating whether the issuing judge had "a substantial basis" to determine that probable cause existed and the warrant should issue.  *Id.*

Here, the consistent details provided in the Affidavit by the witnesses and how they corroborated each other make clear that probable cause existed to support issuance of the search warrant.  Adding or removing the immaterial items contested by Casey would not alter that conclusion.  The Motion should be denied on this basis and no *Franks* hearing ordered.[8]

## B.    The Probable Cause was not Stale

### 1.    Statement of the Law

A warrant may lack probable cause where the facts that establish criminal activity have "grown stale" by the time the warrant issues.  *See United States v. Raymonda*, 780 F.3d 105, 114 (2d Cir. 2015) (probable cause based on single instance of accessing a website nine months earlier where any images would have been in the temporary Internet cache and likely overwritten

---

[8]  The government notes that the defense believes a *Franks* hearing is warranted.  The government also notes that the presence of transcripts of the interviews with the witnesses obviates the need to a *Franks* hearing because it is known what, exactly, was told to the affiant.

found to be stale, but warrant not suppressed based on good faith).  Staleness may arise where

the evidence supporting the warrant "is not 'sufficiently close in time to the issuance of the

warrant' that 'probable cause can be said to exist *as of the time of the search.*'"  *Id.* (citing

*United States v. Wagner*, 989 F.2d 69, 75 (2d Cir. 1993)) (emphasis in original).  There is "no

bright-line rule for staleness," and it must be evaluated based on the facts of the individual case.

*Raymonda*, 780 F.3d at 114 (internal citation and quotation marks omitted).

      Two factors are "critical" in determining staleness: "the age of the facts alleged and the

'nature of the conduct alleged to have violated the law.'"  *Id.* (citing *United States v. Ortiz*, 143

F.3d 728, 732 (2d Cir. 1998)).  Also relevant is whether the supporting affidavit identifies

"continuing conduct or isolated and random instances of illegal conduct."  *See United States v.

Irving*, 452 F.3d 110, 125 (2d Cir. 2006).  If the affidavit establishes a pattern of continuing

criminal activity instead of a one-time occurrence, "the passage of time between the last alleged

event and the warrant application is less significant."  *Raymonda*, 780 F.3d at 114 (citing

*Wagner*, 989 F.2d at 75).

      The question of staleness in CSAM cases is "unique" because "persons interested in

those materials" are likely to hoard such images for long periods of time.  *See United States v.

Irving*, 452 F.3d 110, 125  (2d Cir. 2006) (citations and quotations omitted); *accord Raymonda*,

780 F.3d at 114 ("Because 'it is well known that images of child pornography are likely to be

hoarded by persons interested in those materials in the privacy of their homes,' evidence that

such persons possessed child pornography in the past supports a reasonable inference that they

retain those images—or have obtained new ones—in the present.") (citing *Irving*, 452 F.3d at

125) (citations and quotations omitted).  Before inferring that a person is a "hoarder," it must

first be established that there is "probable cause to believe that [a defendant] *is* ... a collector" of

CSAM. *Raymonda*, 780 F.3d at 114 (citing *United States v. Coreas*, 419 F.3d 151, 156 (2d Cir. 2005)) (emphasis in original). Where there are "circumstances suggesting that he had accessed [such] images willfully and deliberately, actively seeking them out to satisfy a preexisting predilection[,]" it can be inferred that the defendant is a collector. *Raymonda*, 780 F.3d at 115. The "possibility that a suspect's brush with child pornography was a purely negligent or inadvertent encounter, the residue of which was long ago expunged," must be negated. *Id.*

### 2.    Argument

Casey's claim that the probable cause was stale is without merit. First, the statements from the child victims about Casey's previously detailed sexually assaultive behavior established his sexual interest in children. The child victims also noted that Casey had several computers, a fact confirmed by Casey, Justin Hatin, and Shannon Naylor. One of the child victims reported the Casey viewed sexual activity on YouTube (and the child described a specific sex act), necessarily accessing the Internet using a computer. A different child victim reported that she saw MA and SH without underwear on the computer. A third child victim said that Casey rubbed his private parts while looking at pictures. Casey had still images of "girls in bathing suits on his wall." Importantly, Casey told Justin Hatin and Shannon Naylor that he "deleted all his porn for nothing" because he thought that the police had concluded its investigation into the child sexual abuse allegations. The pornography that Hatin and Naylor speculated Casey was referring to, anime porn, is not illegal and there would be no reason to delete it to hide it from the police. The foregoing provides an ample basis for believing that Casey was likely a collector of CSAM.

Casey's comment that he "deleted all my porn for nothing" is important for another reason: in stating that he deleted the pornography, Casey admitted that he had knowingly saved

the probable contraband because he had to delete it.  Unlike the defendant in *Raymonda,* where the probable cause was found to be stale based on contraband images that would be found, if at all, in the temporary Internet cache nine months after *Raymonda* accessed the website, Casey's self-described contraband was saved to a drive.  It is common knowledge, at this point, that material deleted from a drive will still reside on the computer and can be recovered with forensic tools months, if not years, later.

Contrary to Casey's insistence, the Affidavit does not confine its investigation into Casey's activities to a single incident.  A fair reading of the Affidavit is that while the investigation may have originated because of a suspected single incident, the disclosures from the children suggested that the offense conduct occurred over a period of time, not just once.  For example, Jeanne Bomboli stated that her daughter and another girl had been assaulted, though she did not know when the second girl was assaulted.  Further, the initial disclosure to law enforcement of Casey's conduct occurred on July 31, 2020.  (Doc. 54-2, ¶ 2).  Casey told Hatin and Naylor that he deleted all his porn for nothing on or about September 3, 2020.  (*Id.* at ¶ 44). Det. Hurwitch obtained the warrant on March 5, 2021.  (*Id.* at p. 12).  Therefore, only about six months elapsed from when Casey said he deleted his porn and law enforcement obtained the warrant.  Casey's claim that the probable cause was stale should be dismissed.

Lastly, even assuming that the Affidavit did not state probable cause to search for evidence of possession of CSAM due to staleness,  probable cause to search the items listed in Attachment A for evidence of the crime of lewd & lascivious conduct with a minor was not lacking or stale.  Therefore, when the forensic examiner discovered videos of Casey sexually assaulting MA and SH, those videos were properly recovered as evidence of the lewd & lascivious conduct with a child violation.  Those particular videos constitute the offense conduct

in Counts One through Five in the Second Superseding Indictment and should not be suppressed,
even if the Court decides to suppress videos and images of children other than SH and MA found
in Casey's collection as the result of an invalid warrant.

C.      **The Warrant Was Sufficiently Particular**

1.      **Statement of the Law**

The Fourth Amendment provides that a "warrant may not be issued unless probable cause
is properly established and the scope of the authorized search is set out with particularity."
*Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971).  By ensuring that the search is limited to
specific areas and things for which there is probable cause to search, the particularity
requirement "ensures that the search will be carefully tailored to its justifications, and will not
take on the character of the wide-ranging exploratory searches the Framers intended to prohibit."
*Maryland v. Garrison*, 480 U.S. 79, 84 (1987).  In assessing the Constitutional sufficiency of any
warrant, courts must be mindful that "the ultimate touchstone of the Fourth Amendment is
reasonableness."  *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006).

To satisfy the particularity requirement, a warrant must satisfy three criteria.  *See United
States v. Galpin*, 720 F.3d 436, 445 (2d Cir. 2013).  It must: (i) "identify the specific offense for
which the police have established probable cause;" (ii) "describe the place to be searched;" and
(iii) "specify the items to be seized by their relation to designated crimes."  *United States v.
Ulbricht*, 858 F.3d 71, 98-99 (2d Cir. 2017), overruled on other grounds by *Carpenter v. United
States*, 138 S.Ct. 2206 (2018); *Galpin*, 720 F.3d at 445-46.

While "breadth and particularity are related," however, they are also "distinct concepts,"
and a "warrant may be broad, in that it authorizes the government to search an identified location
or object for a wide range of potentially relevant material," without necessarily "violating the

particularity requirement." *Ulbricht*, 858 F.3d at 102; *see also United States v. Scully*, 108 F. Supp. 3d 59, 69 (E.D.N.Y. 2015) (generally, a warrant that authorizes a search for documents and things that constitute evidence of a particular crime is not overbroad).

> 2.    **Argument**

The Warrant was sufficiently particular.  It identified the three offenses under investigation.  It specifically identified the location to be searched – Casey's residence located at 139 Gilman Circle #4, in Colchester, Vermont.  The Warrant detailed what items were to be seized (any and all computers or other types of electronic media devices).  The Warrant outlined what was to be seized (child pornography, and records relating to the possession and promotion of child pornography, including but not limited to user attribution evidence, metadata for files containing child pornography, and correspondence, chat logs, notes, and address books). Nothing more is required by Fed. R. Crim. P. Rule 41 or the Constitution.  Casey's complaint that the Warrant was overbroad should be dismissed.

> D.    <u>**Law Enforcement Relied in Good Faith on the Warrant**</u>

> 1.    **Statement of the Law**

Even if this Court were to conclude that the Warrant was inconsistent with the Fourth Amendment, suppression would not be appropriate.  The Supreme Court has rejected suppression of evidence obtained by officers acting in objectively reasonable reliance on a search warrant. *See United States v. Leon*, 468 U.S. 897, 926 (1984).  More generally, Supreme Court precedent dictates that suppression is a remedy of last resort, to be used for the sole purpose of deterring future Fourth Amendment violations, and only when the deterrence benefits of suppression outweigh its heavy costs. *See Davis v. United States*, 564 U.S. 229, 237 (2011*); Herring v. United States*, 555 U.S. 135, 140-41 (2009).

The exclusion of evidence is a "prudential" remedy created by the Supreme Court, and not a requirement for every violation of the dictates of the Fourth Amendment. *Raymonda*, 780 F.3d at 117.  Because the exclusionary rule was designed to deter government misconduct, it is inapplicable when suppression would provide only marginal deterrence. *Id.*  Instead, the rule applies only when police exhibit "deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights." *Id.* at 118.  Therefore, for law enforcement officials who obtain evidence by objectively reasonable reliance on a warrant obtained from an impartial judge and there is no conscious violation of the Fourth Amendment, there is nothing to deter. *Id.*  Moreover, "evidence obtained by officers in objectively reasonable reliance on a warrant subsequently invalidated by a reviewing court is not generally subject to exclusion." *Raymonda*, 780 F.3d at 118 (internal quotation marks and citation omitted).

Based on *Leon*, the Second Circuit has identified only four limited circumstances where the good-faith exception to the exclusionary rule does not apply to a search warrant:

> (1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable.

*United States v. Clark*, 638 F.3d 89, 100 (2d Cir. 2011) (quoting *United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992)).

### 2.    Argument

None of these four circumstances is present in this case.  As demonstrated herein, the Affidavit did not intentionally or recklessly mislead the reviewing judge.  There is no suggestion that the issuing judge wholly abandoned his judicial role.  The Warrant was not so obviously lacking in probable cause as to make reliance on it objectively unreasonable.  Indeed, the

reviewing judge approved the search warrant.  *See Leon,* 468 U.S. at 921 ("In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient.").  Finally, in the circumstances here, there would not be any deterrent value in suppressing evidence.  "The essential rationale underlying the good faith exception is that the exclusionary rule 'cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity.'" *United States v. Cancelmo*, 64 F.3d 804, 807 (2d Cir. 1995) (quoting *Leon*, 468 U.S. at 919).  If the Court finds that the Warrant lacked probable cause, the good faith exception should apply.

## V.   CONCLUSION

For all of the foregoing reasons, the government respectfully requests that the Court deny Casey's request for a *Franks* hearing, and deny the Motion in its entirety.

Dated at Burlington, Vermont, this 24th day of March, 2023.

Respectfully submitted,

NIKOLAS P. KEREST
United States Attorney

*/s/ Barbara A. Masterson*
BARBARA A. MASTERSON
Counselor to the U.S. Attorney
P.O. Box 570
Burlington, VT 05402
(802) 951-6725